1

```
1            IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLORADO
2
    Case No. 19-cv-01080-RM-MEH
3   _____

4   POPSOCKETS, LLC,

5        Plaintiff,

6   vs.

7   LORA SUZANNE WILCOX and BRADLEY JAMES WILCOX,

8        Defendants.
    _____
9

10           Proceedings before MICHAEL E. HEGARTY, United

11  States Magistrate Judge, United States District Court for

12  the District of Colorado, commencing at 1:33 p.m., June 10,

13  2020, in the United States Courthouse, Denver, Colorado.

14  _____

15           WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

16  ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

17  _____

18                          APPEARANCES

19           MATTHEW GROVES and RAJEEV ADLAHKA,

20  Attorneys at Law, appearing for the Plaintiff.

21           LORA SUZANNE WILCOX and BRADLEY JAMES

22  WILCOX, appearing Pro Se.

23  _____

24              TELEPHONIC STATUS CONFERENCE

25
```

```
 1                P R O C E E D I N G S
 2          (Whereupon, the within electronically recorded
 3  proceedings are herein transcribed, pursuant to order of
 4  counsel.)
 5          THE COURT:  We're on the record in Case Number
 6  19-cv-1080, Popsockets vs. Wilcox.  On the phone for the
 7  plaintiff, please.
 8          MR. GROVES:  Good afternoon, Your Honor.  This is
 9  Matt Groves on behalf of the plaintiff.
10          THE COURT:  Thank you.  And are you there, Mr. and
11  Mrs. Wilcox?
12          MR. WILCOX:  Yes, this is Brad Wilcox.
13          THE COURT:  Thank you, and good afternoon.
14          MR. GROVES:  And, Your Honor, I believe also Mr.
15  Adlakha is on the line.
16          MR. ADLAKHA:  Yes, Your Honor.  I'm here too,
17  thank you.
18          THE COURT:  Okay.  Well, I don't need any further
19  report from the plaintiff, because I've read what they
20  submitted.
21          Go ahead, Mr. Wilcox, did you have something you
22  wanted to say?
23          MR. WILCOX:  Yes, I just have several things to
24  address with the Court.
25          Now, correct me if I'm wrong, but my understanding
```

1    was last week that Mr. Groves had a problem with one of the

2    interrogatories, which is they wanted us to produce the

3    transaction detail which gave the name, address and order

4    information for the -- each PopSocket sale.  And we had

5    specifically sent him an e-mail that morning as a courtesy.

6    The Court did not order us -- we didn't even have to send a

7    soft copy of our responses to Mr. Groves, but we did.  And

8    we notified him, but we had a problem with getting this

9    transaction detail where after so many days it was not

10   giving us the address information which he was wanting.  And

11   I also attached them several copies of the packing list,

12   which the packing list clearly showed on the new orders.  It

13   gives all the complete details as far as the name, address

14   and et cetera.

15          But the other four, which were from 2018 and 2019,

16   as samples I had produced to Mr. Groves, they completely

17   show that all it showed was the buyer's first name and then

18   the city and state on it.

19          Mr. Groves represented to the Court that all of

20   them then last week had the information on it, so I had

21   access to all of them.  Well, that's incorrect.  I did not

22   have access to all of that information.

23          And I did ask Mr. Groves how he wanted to proceed

24   with this, since I'm not able to get this information and he

25   never responded to me and just ran to the courts instead and

1   wanted the Court to sanction me and handle it for him when I

2   gave him the opportunity to let me know, How would you like

3   to proceed with this and resolve this problem?  But as of

4   yet, I have never received an answer from him and he just

5   gave -- got you to order them to give access to my account,

6   but now I -- they have requested permissions from me and one

7   of those permissions were granted.

8           My wife went in and granted them for me, because I

9   was busy that day and I didn't see it.  I found it later on.

10          I had real reservations about it, because my

11   understanding was the Court only told them they were to get

12   the information which pertained to that one interrogatory,

13   which was the transaction detail for the sales data, but

14   instead, I took it as they were using this as a fishing

15   expedition and they went in and clearly got other

16   information, which they were not to be getting, and that

17   information was already disclosed to them on the other --

18   the interrogatories on other numbers which they never even

19   addressed with the Court that somebody had access to that

20   information.

21          And so I'm wanting to clarify:  Weren't they only

22   supposed to be getting the information for the transaction

23   detail, which is the city, state, address, name, sales

24   details for the PopSockets orders?  Or are they allowed to

25   go in and just fish around, explore my account and get

1   whatever else they wanted?

2          Because if I would have produced the one

3   interrogatory, they would have never gone into my account

4   because they were only questioning one interrogatory.

5          THE COURT:  Okay.  Well, hold on.

6          So Mr. Groves --

7          MR. GROVES:  So, Your Honor --

8          THE COURT:  Hold on.  Nope, no.  I want to ask you

9   a question.

10          MR. GROVES:  Oh, sorry, sorry.

11          THE COURT:  Have you produced to the Wilcoxes all

12   the data that you retrieved?

13          MR. GROVES:  We have not yet.  We only just

14   received it last evening.

15          THE COURT:  Okay.  So as soon as you can humanly

16   put that together you need to provide Mr. Wilcox all the

17   data that you retrieved.

18          MR. GROVES:  Yes.

19          THE COURT:  And then, Mr. Wilcox, I think we'll

20   have a more educated discussion about whether they did

21   anything that exceeded my permission.  But I would like you

22   to look at everything they got first and then --

23          MR. WILCOX:  Okay.

24          THE COURT:  -- you can tell me what you think was

25   beyond the scope.  Okay?

1          MR. WILCOX:  Okay, yeah.  Because I asked that --

2     I sent an e-mail over the weekend and asked them to send me

3     the -- all of the information and whatever -- and whoever's

4     had access to the account, who's gone in and looked at the

5     information, send me the names and addresses of those

6     parties and all of the documentation -- I want -- I want

7     them to produce everything to me.  And they just exerted

8     Rule 33 and Rule 34 and told me they did not have it ready

9     and that they had 30 days to produce that to me.

10          THE COURT:  Okay.  Well, it won't be 30 days.  I

11     mean, I'm asking them to do it as soon as possible.  So, I

12     mean, I would assume that can be within -- certainly by

13     Monday.  Right, Mr. Groves?

14          MR. GROVES:  And we can do it my Monday, Your

15     Honor.

16          THE COURT:  Okay.  Let's do that.

17          All right, Mr. Wilcox --

18          MR. WILCOX:  Your Honor --

19          THE COURT:  -- anything else?

20          MR. WILCOX:  Sorry.  And then, well, now on these

21     -- like when the attorney signs the responses and gives them

22     to us, my understanding is they're supposed to be putting

23     their attorney's signature on the section with the name,

24     address, license number and all of that information on each

25     response.  We've not been getting that.

1          All we are getting is just simple, like, Ed --

2    whatever his last name is, I think Hart (inaudible) partner.

3    That's all they're putting on it.  They're not putting their

4    full signature like which is supposed to be required to my

5    understanding; is that correct?

6          THE COURT:  Right.  No.  So when you submit

7    discovery to your opposing party we want that party to

8    answer it and so the party's signature is supposed to be on

9    it verifying all the answers.

10          Now, the attorney only signs as to objections, but

11   the information is verified by an actual client.  We don't

12   want attorney's answers, we want real people's answers.

13          MR. WILCOX:  (Inaudible), Your Honor.

14          THE COURT:  So it would be a representative of

15   PopSockets who would have to sign and verify all answers to

16   discovery.  The attorney would only sign as to objections.

17   And all they have to put down is their -- you know, their

18   firm address and usually e-mail and phone number.

19          Is that kind of what you're asking?

20          MR. WILCOX:  Yes.  They've not been doing that,

21   because I thought in order for it to be legal and for it to

22   be appealable and for us to use as evidence, I thought the

23   attorney had to have their signature or stamp or have like

24   attorney name, address, city, state, zip code, license

25   number, phone number, fax number, e-mail, that information.

1                THE COURT:  No.  Just the kind of information that

2       they include on every pleading.  And they don't have to

3       include a license number, because in federal court, we only

4       require that any person who appears before this court as a

5       lawyer be a member in good standing of some Bar somewhere

6       and not be disciplined by any Bar.

7                And so as long as that fulfilled -- requirement is

8       fulfilled, they simply have a signature block.  Like, for

9       example, on the public docket here, it's Matthew Ray Groves,

10      Groves Law, LLC, 281 South Pearl Street, Denver, Colorado,

11      80209, (303)557-0199, fax number, e-mail.  That's all there

12      for the public to see and you can certainly have it.

13               MR. WILCOX:  Yeah.

14               MR. GROVES:  Your Honor --

15               MR. WILCOX:  And so I'm (inaudible) and I had

16      asked for -- when I had repeatedly asked for them to produce

17      evidence of our specific business contacts in Colorado, it's

18      like, all of a sudden, Mr. Groves now has a partner and that

19      partner is the one who's responding to us.  And, I mean, he

20      doesn't have any prior knowledge, he's not been on the case.

21      I guess I'm just -- I don't quite understand why, all of a

22      sudden, Mr. Groves has a partner just putting his name on

23      there:  Ed, last name, (inaudible) partner.  And that's all

24      they're responding to me on what they -- when they object

25      and when they don't want to produce evidence and documents,

1   they --

2          THE COURT:  Well, any --

3          MR. GROVES:  Your Honor, if I may clarify.

4          THE COURT:  Sure.  But any attorney of record is

5   allowed to sign matters in this case.  So it doesn't have to

6   be Mr. Groves.

7          MR. WILCOX:  Okay.

8          THE COURT:  But go ahead, Mr. Groves.

9          MR. GROVES:  Well, I want to, just so we have a

10  complete record, you know, on the transcript here.  The --

11  what -- what -- the only discovery to which we've responded

12  which needed to be responded to so far, although others are

13  outstanding, we responded to on March 23rd.  He's raised

14  this in the two prior hearings.  We've addressed it, we

15  responded to it on March 23rd with formal responses.

16         They were requests for production which I, as the

17  attorney for PopSockets, did sign and we feel that's

18  appropriate and so we've submitted him this.

19         What he's referencing is a covering that my

20  partner sent him saying, Here's our request for productions.

21  And he also mailed them to him.

22         THE COURT:  Right, but --

23         MR. GROVES:  So I just don't want --

24         THE COURT:  Well, you don't disagree that

25  discovery responses are supposed to be verified by a client?

1          MR. GROVES:  Interrogatories.

2          THE COURT:  Well, even -- even responses to just

3   -- to document requests are supposed to be information

4   that's provided by the client.  It may be massaged or

5   written by a lawyer, but it has to be the client's

6   information, right?

7          MR. GROVES:  It is the client's information, but

8   certainly an attorney can verify the response and respond to

9   a request for production or a request for admission.  An

10  interrogatory, certainly the -- the client has to sign.

11         THE COURT:  Right.

12         MR. ADLAKHA:  Your Honor, if I may.  I think

13  there's a miscommunication here.  I don't think Mr. Wilcox

14  was referring to our formal discovery documents or our

15  pleadings.  All of those have full signature blocks, as are

16  typical in court proceedings.

17         I think he's referring, as Mr. Grove said, to our

18  e-mails.  He sends us many e-mails throughout the course of

19  a week.  And we respond to them, you know, when they

20  weren't -- and I think he's objecting that we often do not

21  have our license numbers or things like that on those

22  e-mails.

23         THE COURT:  I don't require license numbers.  So

24  that's not an issue, okay.

25         MR. ADLAKHA:  And, Your Honor, on the Popsockets

1  information, just again, it was not one interrogatory -- or

2  the -- I'm sorry, the Amazon information.  This was the

3  multiple requests for production that were not responded to

4  were the subject of our motion under Rule 37(b), were the

5  subject of the February 20th hearing.  And what the Judge

6  said -- or I'm sorry, what the Court said last week was,

7  Well, if he's not giving it to you, then the expert can do

8  it.  And that's what the expert did.  And just for clarity

9  on the record for -- from our position, that's exactly what

10  happened.

11         THE COURT:  Okay.

12         MR. GROVES:  Your Honor, we did produce

13  everything, too.  They were (inaudible) interrogatories.  We

14  answered the interrogatories and sent them to you by the

15  date the Court ordered, which was a week ago -- last week --

16  it was last week when we were ordered to produce those to

17  you and we did.  We simply wrote what the Judge told us to

18  write and produced what the Court ordered us to produce.

19         You've received all of that, so there was no

20  (inaudible) information

21         MR. ADLAKHA:  (Inaudible).  Sorry.

22         MR. GROVES:  (Inaudible) detail.

23         MR. ADLAKHA:  So -- just, Your Honor, again, so I

24  have a complete record:  As interrogatory responses, I think

25  he included five transactions -- information on five

1   transactions.  There are over 3000 PopSocket sales,

2   including scores of transactions into Colorado that were

3   revealed on the Amazon account.  And so that's --

4           THE COURT:  Well, but so --

5           MR. ADLAKHA:  -- frankly, why --

6           THE COURT:  Right.

7           MR. ADLAKHA:  -- you ordered us, Judge, to have

8   our expert do it and that's what he did.  We did not go

9   beyond the scope of anything and we didn't go beyond the

10  scope of the permissions specifically granted to us by the

11  Wilcoxes.

12          THE COURT:  I understand your position, but I need

13  to know clearly whether you have the discovery you need now.

14          MR. ADLAKHA:  We have what we can get from the

15  Amazon account.  There is certain information not contained

16  within the Amazon account that we still do not have.

17          THE COURT:  What?

18          MR. WILCOX:  And what is that?

19          MR. ADLAKHA:  So the -- so, for instance,

20  communications regarding others regarding this case,

21  including with customers.

22          And so that was something that in the February

23  28th hearing Mr. Wilcox had said that he didn't have any

24  response from Popsockets customers.  The Amazon report

25  reveals that at least four people filed complaints.

1              In his interrogatories, he stated that he only

2     gets a complaints.  He responds on Amazon and then contacts

3     the buyer directly.

4              MR. WILCOX:  (Inaudible).

5              MR. ADLAKHA:  We don't have any documentation of

6     those communications with the complaining customers.

7              THE COURT:  Okay.  The -- we'll start with that --

8              MR. WILCOX:  Complaints for what?

9              THE COURT:  And go ahead, Mr. Wilcox.

10             MR. WILCOX:  When you say complaints, you need to

11    be more specific.  Complaints for what?  Until I see the

12    evidence, again, that was not the scope.  The scope was the

13    transaction detail, which was the name, address.

14             And I have asked, also, if your expert was able to

15    produce the names and addresses in full for the buyers that

16    he needs to disclose that to me so that I can replicate it,

17    test it myself and verify it, and I have yet to have that

18    produced to me either.

19             So was your expert able to get the names,

20    addresses for everybody?  Or is it just a name and the city

21    and state (inaudible) that's contained on our report?

22             THE COURT:  But -- and, Mr. Wilcox, what we're

23    talking about right now is they said there are four

24    complaints that you have previously said that when you have

25    a complaint, you respond to Amazon and you contact the

1   customer directly.

2          Let's start with that.  Is that true?  When you --

3   when a complaint is submitted to Amazon, do you respond to

4   the customer directly?

5          MR. WILCOX:  Well, first off, he needs to define

6   the complaint is.  What complaint are we talking about?  Are

7   we talking about a product review?  Or are we talking about

8   them contacting Amazon directly?  Are we talking about an A

9   to Z claim?  Are we talking about a return?  What exactly

10  are we talking about here?

11         THE COURT:  Okay.  Go ahead, Mr. Groves.

12         MR. ADLAKHA:  I can clarify that, Your Honor.

13         THE COURT:  Go ahead.

14         MR. ADLAKHA:  I think what Mr. Groves was

15  referring to was seller feedback.  We found four instances

16  of negative seller feedback.

17         THE COURT:  Okay.

18         MR. WILCOX:  Well, feedback was addressed in a

19  separate interrogatory.  We're talking about complaints

20  here; we're not talking about feedback.

21         THE COURT:  Okay.  Well, let's talk about

22  feedback, though, Mr. Wilcox.  When you get customer

23  feedback, do you respond to it?

24         MR. WILCOX:  It depends on what they -- it depends

25  on the feedback.  It depends on what the purpose -- what the

1    feedback is, what the problem -- or what the problem is or

2    if it's a product review, as far as feedback, it depends on

3    how to respond on as to what the feedback is.

4          If it's a product review, I'll report to Amazon,

5    Amazon removes it, or they'll strike through it.  If it was

6    feedback where -- from our perspective, I have no control

7    over that, because PopSockets is notorious for not sticking

8    to -- (inaudible) they're not sticking to OtterBoxes and

9    people don't -- and report that on -- as a feedback, when

10   that's not my doing.  That's not something that I caused.  I

11   don't think it's just application on the back of PopSocket.

12   That's a part of the manufacturing, engineering and quality

13   control of PopSockets.  If they can't get their part to

14   stick on certain stones or materials, that's not my problem.

15   And I'm -- I should not be having to respond to complaints

16   about that,

17         But now if people complain about it being late,

18   then I have to respond to those.  I respond to those and

19   find out why it was late or if it was because out here, the

20   last two months, the Post Office has been experiencing

21   delays and mail delivery that caused delivery problems with

22   -- I guess without seeing the evidence, without Mr. Groves

23   disclosing to me what four items he is talking about, I

24   can't responsibly answer each of them without seeing them.

25         THE COURT:  Mr. Groves, do you have at your

1    fingertips the four names?

2              MR. GROVES:  Just -- if you'll give me one moment,

3    Your Honor, I believe --

4              THE COURT:  Okay.

5              MR. GROVES:  Yes.  I just have to -- to get to

6    that.

7              MR. ADLAKHA:  I have it here, Your Honor, the way

8    our expert provided it to us.  We have the (inaudible) and

9    we have the order number to which it relates.  I don't have

10   the name of the customer here.

11             THE COURT:  Go ahead and read it out loud.

12             MR. ADLAKHA:  Okay.  The first --

13             MR. WILCOX:  And now --

14             MR. ADLAKHA:  The first one is:  Never received

15   the product.  The second one is:  Item was supposed to be

16   here between February 26th to March 1st and it still hasn't

17   arrived.

18             THE COURT:  Well, no.  Give order numbers for each

19   one of them, please.

20             MR. ADLAKHA:  Oh, the order numbers?  Sorry.  My

21   apologies.

22             The first one is 114-7735471-3602666.

23             THE COURT:  Okay.

24             MR. ADLAKHA:  The next order number is

25   114-8095818-9765862.  The next order number for the third

1    item is 111-6712228-3414623.  And the order number for the

2    fourth is 112-8084458-2861818.

3              THE COURT:  Did you get all of those, Mr. Wilcox?

4              MR. WILCOX:  I mean, yeah, order numbers don't

5    really mean anything to me.  I need to know what the

6    feedback is.  Because here, again, we're talking about

7    feedback, which is totally separate from complaint as far as

8    I remember on the interrogatories.  They were two separate

9    sections is what I'm remembering.

10             THE COURT:  Okay.  But did you get those numbers

11   down?

12             MR. WILCOX:  I didn't write them down but --

13   because Mr. Groves was supposed to produce them for me, so

14   they'll be on the record and I'll be able to reference them

15   on the transcript.

16             But now I'm confused because when I asked for

17   these reports, Rajeev told me that they aren't going to have

18   anything ready, or have any of this material or evidence as

19   -- at the time of the hearing, but yet they're producing it

20   to the Court.

21             So I guess I'm confused why they couldn't produce

22   it to me, but they could produce it to the Court today.

23             THE COURT:  Well, digging through some material

24   and reading four numbers is a little bit different than

25   packaging everything up in a way that you can use it and

1    sending it off to you.

2          So I'm not going to throw stones on that one, but

3    I don't want it -- I mean, it costs money to produce

4    transcripts of what we're doing.  I don't know --

5          MR. WILCOX:  Yeah.

6          THE COURT:  I don't think you're ordering

7    transcripts, are you, Mr. Wilcox?

8          MR. WILCOX:  I haven't, no.

9          THE COURT:  Okay.

10         MR. WILCOX:  But Mr. Groves is going to be

11   producing -- is supposed to produce this to me.  So I'm just

12   going to wait for that time, then because I need more -- I

13   guess to me what matters is the feedback.

14         THE COURT:  Okay.  Well, send him an e-mail, Mr.

15   Groves, that has both the verbatim feedback and the number.

16         MR. GROVES:  Yeah.  This is one of the reports,

17   Your Honor, that we will be providing him.

18         THE COURT:  Very good.  But I want you to make it

19   very clear that you expect him to respond with any

20   communications arising out of those four, okay?

21         MR. GROVES:  It's not just those four, Your Honor.

22   I mean, I think the issue was, you know, we've seen that he

23   has now over 3000 sales at issue and he's represented to the

24   Court previously he's had no communications with any

25   customers of PopSockets -- or any of those 3000 customers.

1   And I guess that's theoretically possible, but we just

2   wanted to confirm because it seems very implausible to us.

3              THE COURT:  Okay.  Well, I mean, obviously, if you

4   think that he said that in a way that's admissible at trial

5   or in summary judgment and you come forward with evidence

6   that that's wrong, that's impeachment.

7              So that's the way things go.

8              MR. WILCOX:  And so where on this -- so on this

9   feedback then, okay.  Just because we have read the

10  feedback, but where's my responses to them?  Did you read my

11  responses?  Or did you --

12             MR. GROVES:  That's what we're --

13             MR. WILCOX:  (Inaudible).

14             MR. GROVES:  Your Honor, that's what we're asking

15  about.  We can't see that on the Amazon platform.  His

16  communications with the customers would only be in his

17  e-mail through the Amazon --

18             THE COURT:  Okay.

19             MR. GROVES:  -- messaging.

20             THE COURT:  That's fine.

21             MR. WILCOX:  And I didn't respond to any of the

22  feedback, right?  There's no responses on the feedback.

23  That's where I would have responded was on the feedback.

24             THE COURT:  Right.  What he's saying is if -- did

25  you respond to these customers through your own e-mail

1   account, I think is what you're saying?

2           MR. WILCOX:  My own e-mail account?  No.

3           THE COURT:  Mr. Groves, is that what you're

4   asking?

5           MR. WILCOX:  (Inaudible) through my own e-mail

6   account.

7           MR. GROVES:  Yes, Your Honor.

8           MR. WILCOX:  You can't do that.

9           MR. GROVES:  Well, this (inaudible).

10          MR. WILCOX:  That violates Amazon's rules.

11          MR. GROVES:  (Inaudible).  Go ahead.

12          MR. ADLAKHA:  As we understand it, the way the

13   Amazon messaging system works, we can't see on the seller's

14   central account any messages he had with customers.  The way

15   it works is it goes to your e-mail.  Now it's a -- it masks

16   the e-mail address, so you don't see the e-mail address of

17   the people you're sending to.  You send it through the

18   platform, but any responses show up in your e-mail.

19          That's our understanding from our expert.

20          MR. GROVES:  And his interrogatory response, Your

21   Honor, was both responding to customer messages received

22   through Amazon messaging and response to negative buyer

23   feedback by contacting the buyer directly.

24          MR. WILCOX:  (Inaudible) sorry.  That's -- Mr.

25   Groves, that's if I need to respond to the buyer feedback.

1    I don't always respond to the feedback and all of it does

2    not always need to be responded to either.

3           If I do respond to the feedback, you'll see the

4    post out there.  You'll see my -- anybody can go into my

5    account and they'll see it right there.  They'll see that

6    I've responded to feedback.  And I've either given an

7    explanation for it or Amazon's removed it.

8           And I'll -- now, and also if you look at all the

9    Colorado sales, you will also see -- should also see that

10   those orders have been canceled, too.  We did cancel those

11   orders for Colorado.

12          So if you look at them, you will see that they

13   have been canceled and refunded, also.

14          THE COURT:  Okay.  Well, I am sort of --

15          MR. WILCOX:  (Inaudible) manufacturing contacts in

16   Colorado, trying to use that to manufacture contacts and

17   having people associated with PopSockets ordering on behalf

18   of them to manufacture contacts.  And that's why we weren't

19   settling -- we weren't selling in Colorado.

20          THE COURT:  Okay.

21          MR. GROVES:  Well --

22          THE COURT:  So just, Mr. -- are you in -- Mr.

23   Groves, are you looking only for communications that arise

24   out of the sale of your client's product?

25          MR. GROVES:  Yes.  Yeah, this is just

1    PopSockets-specific.  And he -- one of these, which is not

2    canceled as best we can tell, was last week.

3              THE COURT:  Okay.  So all you have to do, Mr.

4    Wilcox, is just make sure that you have responded with any

5    record you have of communications to customers concerning

6    PopSockets.  That's all.  And then --

7              MR. WILCOX:  Okay.

8              THE COURT:  -- produce those and then tell them, I

9    have produced everything.  Okay?

10             MR. WILCOX:  Okay.

11             THE COURT:  All right.  What else, Mr. Groves?

12             MR. GROVES:  So we had asked for information

13   regarding cost associated with the sales of PopSockets

14   product.  As part of his records, he did produce all of his

15   receipts from his purchases.  After the hearing last week,

16   he sent us an e-mail listing 15 other categories of cost for

17   which we've received no documents.

18             Now, if he's not going to present evidence of

19   these other 15 categories of cost at trial, then we don't

20   need to waste the Court's time if he's -- if he will

21   stipulate that these 15 categories of cost won't be produced

22   at trial.  If he's going to produce them as trial evidence,

23   we need the evidence of them.

24             THE COURT:  Well, here's the thing:  Any judge I

25   know requires a party's evidence to have been submitted in a

1   Rule 26(a)(1) disclosure.  And if it didn't appear there, it

2   can't come in at trial.

3           So Mr. Wilcox will have to have produced all the

4   information he intends to use at trial or he can't use it.

5   That's -- I -- you know, I don't know how -- what other way

6   to deal with that than to just say on the record that every

7   judge I know, including myself, would strictly enforce that.

8           If you want to introduce evidence at trial, that

9   has to have been produced during discovery.  So Mr. Wilcox

10  has heard that and you can repeat that to Judge Moore.  I'm

11  sure he follows the same rule.

12          MR. WILCOX:  And how am I going to produce this

13  evidence, especially on my tax return, which is under a

14  business?  I mean, my effective tax rate, I can show you

15  what it is.  I mean, I've paid income tax, I've got overhead

16  cost, I've got cost of printer, cost of paper, cost of ink.

17  There is -- I mean, overhead, there is no way to show a

18  per-unit cost or a -- you know, I can get a receipt that

19  shows where I've purchased ink, I've purchased paper, I've

20  purchased (inaudible) -- we allocate part of our phone bill

21  to the business.  That's a cost of doing business.  I have

22  mileage involved from driving from store to store to acquire

23  PopSockets product.  I mean, what am I supposed to produce

24  then in regards to those overhead items that I have given

25  them already?  And the other items, as far as the shipping

1    cost, they should have gotten all of that when they

2    downloaded my information.

3            They've had access to my account, they should have

4    gotten all of that information.  We purchase shipping

5    through Amazon.

6            THE COURT:  Right.  But Mr. Wilcox, all he's

7    saying is if you intend at trial, for example, to get up and

8    say, I received $10,000 in gross income from my sale of

9    PopSockets, but it cost me $9500 to do that and here's all

10   the reasons why, because I'm going to say it cost me this

11   much in mileage and this much in paper and this much in

12   phone bills and this much in Amazon fees, if you're going to

13   engage in that analysis at trial, then all he's asking is

14   that you produce that right now so he knows what you're

15   going to do.

16           Does that make sense?

17           MR. WILCOX:  I mean, I produced him a list and

18   explanation of all the costs.  I guess I'm -- he needs to

19   clarify more to me what exactly he wants.

20           THE COURT:  Well, have you done a deposition yet

21   in this case, I guess, Mr. Groves?

22           MR. GROVES:  Not yet.  That's one of the items I

23   wanted to address today was getting those reset.  We

24   canceled them due the COVID.  They were set during the

25   height of the COVID --

1           THE COURT:  Okay.

2           MR. GROVES:  -- and we need to get that reset.

3           THE COURT:  All right.  So, you know, that's

4  something that for normal business would be a good subject

5  for a 30(b)(6).  Do you intend to go into this kind of a

6  line of questions at the deposition?

7           MR. GROVES:  Well, it -- I think we -- the Court

8  has specifically described what the Rule 26(a)(1) requires

9  and rules, and I don't know what we will discuss in that

10  regard at the deposition in the absence of no disclosure.

11  So --

12          THE COURT:  Okay.  But did -- I mean, have you

13  asked him in writing what was the gross receipts from the

14  sale of PopSockets and what he believes his cost of goods

15  sold is?

16          MR. GROVES:  Your Honor, we had --

17          MR. ADLAKHA:  We had asked that in an

18  interrogatory, yes, and his response was he was unable to

19  calculate it.

20          THE COURT:  Okay.  Well, then he can't -- I mean,

21  if the answer is he was unable to calculate it, then I would

22  -- if I were the trial judge, I would say he's precluded

23  from introducing any such evidence at trial, that's --

24  unless he supplements that response.  So I don't know what

25  else you want me to do.

1            MR. ADLAKHA:  I think that's good enough.

2            MR. WILCOX:  Yeah, Mr. Groves --

3            MR. GROVES:  That's fine, Your Honor, we

4    understand.

5            THE COURT:  Okay.

6            MR. WILCOX:  Now, Mr. Groves has all my sales

7    data.  He's gotten all that, he's got that information, he's

8    got all my receipts.  So I mean --

9            THE COURT:  Can I have some idea -- Mr. Wilcox, do

10   you have a ballpark on your gross receipts for PopSockets

11   sales?

12           MR. WILCOX:  I have no idea.  No, because I have

13   not ever seen them so much as I don't go in and run the

14   reports.  I don't have time to be doing that, doing any kind

15   of financial analysis right now.  And I haven't since the

16   start of this, running it by myself and then COVID and

17   having to hire people and --

18           THE COURT:  I know.  Yeah, I'm not asking you for,

19   you know, down to the dollars and cents.  But even a gross

20   number like 10-, 15-, $20,000, $5,000?  Do you have any idea

21   at all?

22           MR. WILCOX:  No, I don't.

23           THE COURT:  Do you, Mr. Groves?

24           MR. GROVES:  I know he has sold over 3000 of

25   these.  We have not yet calculated what those gross sales

1    are.

2         THE COURT:  Well, but do you know a -- give me a

3    typical price for the -- a sale.

4         MR. GROVES:  20 --

5         MR. WILCOX:  $15.  So $15, 3000.  There's about

6    $45,000.  My cost of sales is probably -- is about

7    two/thirds of that --

8         THE COURT:  Okay.

9         MR. WILCOX:  -- so less 70 percent cost of goods

10   sold.

11        THE COURT:  So, Mr. Wilcox, do you believe in your

12   heart that for all the things you sell you have about a

13   two/thirds cost of goods sold?

14        MR. WILCOX:  Not everything.  But -- yeah, but

15   just PopSockets because it's more competitive and there's

16   people out there selling and I'm a secondary seller.

17        I mean, I sell way above (inaudible), so -- and

18   I'm also enriching PopSockets.  I'm enriching their

19   customers with Walmart, Target.  So I don't -- I guess I

20   don't -- I never have understood why we're even here, why

21   they're wasting their time and money, especially if we're

22   talking about $45,000 in sales, less $30,000 cost of goods

23   sold and then we've got overhead cost and I mean --

24        THE COURT:  Okay.

25        MR. WILCOX:  -- that's a waste of their time in my

1    opinion, and money.

2         THE COURT:  Understood, and then --

3         MR. WILCOX:  And that --

4         THE COURT:  -- ultimately you'll be able to make

5    that argument.

6         Okay.  What else, Mr. Groves?

7         MR. GROVES:  The -- we had had a couple of

8    requests for production regarding interrogatory -- and their

9    (inaudible) interrogatory about his communications with

10   others regarding the case.  In the February 20th hearing, he

11   told you he'd only had verbal communications.  He responded

12   to it, the interrogatory, saying that he had also

13   communicated on various online blogs with the U.S. Attorney

14   General and others.  And we just want confirmation as to

15   whether he's been blogging about this case, the claims in

16   this case.  And then we want that type of information and

17   this communication in writing with all of these various

18   people that he's listed.

19        THE COURT:  Okay.  Mr. Wilcox?

20        MR. WILCOX:  Okay.  I thought -- from what I

21   remember saying, it was only related to -- it was -- I had

22   looked at the transcripts and I remember oral communications

23   only regarding people at PopSockets, is what I'm remembering

24   -- I remember reading.

25        You had asked me if I had talked to anybody at

1    PopSockets.  And I said, No, except for David Barnette (ph)

2    and Mr. Groves already has those communications and he said,

3    Okay, he's already answered this, then.  It's already done,

4    it's already been produced.

5           THE COURT:  Well, no.  What he's asking is:  Have

6    you written anything online, which is fine if you did, you

7    have a First Amendment right.

8           MR. WILCOX:  No.

9           THE COURT:  But have you written anything online

10   critical of what Popsockets is doing?  That's what he's

11   asking.

12          MR. WILCOX:  Yes, I've written many things.

13          THE COURT:  Okay.  And have you produced those?

14          MR. WILCOX:  No, because I -- because there were

15   too many -- I was waiting for him to answer if I -- from

16   what I remember, I think he's -- I believe he has said that

17   that would be for a deposition, I think, is that he said he

18   had -- save those for deposition.

19          MR. ADLAKHA:  Your Honor, I --

20          MR. WILCOX:  (Inaudible).

21          MR. ADLAKHA:  Your Honor, what happened at the

22   February 20th conference is when you went through these

23   requests, he said he's only had verbal communications.  And

24   you said at that point, Your Honor, if that's the case, they

25   can explore them at the deposition.

1            THE COURT:  Okay.  Well, hold on.

2            MR. WILCOX:  Yes, I'll be glad to give them

3    whatever's out there, what I've posted, but now --

4            THE COURT:  So here's what you're referring to, I

5    think.  All documents relating to written, oral recorded

6    statements.  And that -- I don't think that refers to what

7    we're talking about right now.

8            MR. GROVES:  I think there were other discussions

9    relating to broader document requests, like requesting all

10   documents, including communications relating to the

11   allegations in the case.

12           MR. WILCOX:  Well, and also, like I mentioned last

13   week, the copy I was given on 12/30/19 does not match the

14   copy that Mr. Groves presented to the Court and the Court

15   reviewed on that 2/20; that there's been many changes

16   between, like, number 11 and 22, there's been deletions,

17   insertions.  So it is not in line with what I was sent.

18           THE COURT:  Well, I don't -- I don't -- I can't

19   read this transcript as --

20           MR. WILCOX:  I don't remember ever answering

21   about --

22           THE COURT:  Well, we were talking about documents

23   -- things you had received.

24           But, Mr. Groves, what you're talking about right

25   now are things he's written.  So give me the discovery

1   request --

2            MR. WILCOX:  Okay, that's fine.

3            THE COURT:  Give me the discovery request that

4   would cover that.

5            MR. GROVES:  The Request for Production Number 5,

6   Your Honor.

7            THE COURT:  Read it out loud.

8            MR. GROVES:  Which is called -- all the documents

9   he has regarding -- sorry, I'm just looking through it --

10  PopSockets, the product and any of the issues, allegations,

11  denials, claims or defenses in this action.  If he's

12  blogging about this lawsuit, then we want to receive copies

13  of that.

14           THE COURT:  Well, yeah.  I mean --

15           MR. GROVES:  And he --

16           THE COURT:  I'm not going to say that Mr. Wilcox

17  would have recognized reading that interrogatory that that's

18  what you meant.  I think technically it falls within that,

19  but I'm not going to fault him for not understanding that

20  you are asking for blogging or posts that he's made.

21           But, so, Mr. Wilcox, if you do have any blogs,

22  posts, complaints, things you've written, exercise of First

23  Amendment rights, you need to produce those, okay.

24           Because what happens is every party -- everything

25  a party says under our rules of evidence could be evidence

1    and could be admissible under a rule called Rule 801.

2    They're called Statements by Party Opponents.  And if

3    they're relevant to the issues, which this -- these might be

4    since they concern the lawsuit by PopSockets -- then that's

5    stuff that you need to just download in some way and send it

6    to him.  Okay?

7              MR. WILCOX:  Okay.

8              THE COURT:  All right.

9              MR. WILCOX:  And if you'd advise Mr. Groves, if he

10   wants this stuff, instead of fighting so we have a hearing

11   and addressing it with the Court, make him start addressing

12   it with me and sending me e-mail requests, instead of just,

13   Oh, here comes the hearing date, let's address it now with

14   the Court, instead of giving me the chance to respond to it

15   or take care of it.

16             THE COURT:  Okay.  Well, are you promising that

17   when he does that, you'll do what he asks?

18             MR. WILCOX:  As long as it's within reason and he

19   doesn't make any threats to me, like he always does with his

20   motion practice and sanction threats that should not be used

21   as a tool to try to get me to comply with requests.

22             I mean, I can't always trust his requests.  That's

23   why I'm always hesitant to respond because I'm so used to

24   him giving me threats for -- to file a motion or threats to

25   sanction me if I don't do this.  And most of the time, it's

1   never something that actually materializes.

2        THE COURT:  Okay.  Well, I want you to have that

3   process from now on where he says, you know, Here's the

4   request that we gave you and we think this type of document

5   is within that request.  So if you have any, would you

6   please produce it to us?

7        Yes, please do that from now on.  But as to what

8   we're just talking about, Mr. Wilcox has already agreed to

9   do that.

10        So what else, Mr. Groves?

11        MR. GROVES:  Just so I have a statement on the

12   record, we certainly have tried to do that, Your Honor.

13   And --

14        THE COURT:  Okay.

15        MR. GROVES:  -- you have had a glimpse of the

16   e-mail communications --

17        THE COURT:  Okay.

18        MR. GROVES:  -- in our motions for sanctions under

19   Rule 37.  We will endeavor to continue doing that.  But the

20   reason we are on our fourth discovery hearing is because

21   that does not work, but we will continue trying in good

22   faith as officers of the Court.

23        THE COURT:  Well, you're not even close to a

24   record.  If this is only the fourth, you're not even close

25   to a record for me, so.

1          MR. GROVES:  I'm sorry.

2          THE COURT:  Go ahead.  What else?

3          MR. GROVES:  The communications with PopSockets,

4   you know, his response is:  The only documents, e-mails we

5   have are the e-mails sent to David Barnette.  And he already

6   has these e-mails, he being me, Mr. Groves.  We were

7   certainly copied on some of them, but I had no idea that

8   they have all of them.

9          PopSockets had to put in a specifically made

10  e-mail blocker for Mr. Wilcox because of the nature of the

11  e-mails he sent, which we have seen copies of.

12         I just want to make sure we have everything he

13  sent to PopSockets.

14         THE COURT:  Okay.

15         MR. GROVES:  And he's produced nothing saying,

16  Well, you've got it, you were copied on them.  I mean, on

17  some of them I was, but he has them and he can easily

18  produce to us what he sent.

19         THE COURT:  Okay.  Well, communications between

20  you two are -- I mean, between the Wilcoxes and the company,

21  that's certainly relevant.

22         So have you tried to look for those, Mr. Wilcox?

23         MR. WILCOX:  I mean, as far as I know, I've always

24  -- you know, I'll go back and look through the e-mails and

25  make sure there's nothing that Mr. Groves is not copied on,

1    but I always try to copy counsel on everything.

2            THE COURT:  Okay.  You don't have to produce

3    anything that you've produced to Mr. Groves, but you do have

4    to produce anything that was just sent to the company and

5    not copied to an attorney.  Okay?

6            MR. WILCOX:  Okay.

7            THE COURT:  All right.  Is that it?

8            MR. GROVES:  The -- one other clarification, Your

9    Honor, on his purchases.  On May 28th, he did produce to the

10   document service receipts of his purchases and it -- but his

11   interrogatories he produced a week later and stated that he

12   -- he -- I will provide all of these documents regarding

13   purchases.

14           I just -- you know, when I see the "will provide,"

15   I don't know if there's something else out there and I just

16   wanted to confirm that he's produced his purchases -- all of

17   them to us.  If there's additional ones, then I'm -- you

18   know, obviously, we want to get those as well.

19           THE COURT:  All his purchases of PopSockets?

20           MR. GROVES:  Correct.  Sorry, yes.  Yes, Your

21   Honor.

22           THE COURT:  Okay, yep.

23           Do you think you did that, Mr. Wilcox?

24           MR. WILCOX:  Yes.  I just simply copied and pasted

25   what -- from the transcript what -- verbatim what was told

1   to us on 2/20.  I did the interrogatories, based on the 2/20

2   date hearing.

3           THE COURT:  No, I know, but did you -- do you

4   think you produced to him all the receipts you have from

5   your purchase at Popsockets?

6           MR. WILCOX:  From the time that the document

7   server picked up, yes, but I've had subsequent purchases

8   after that.

9           THE COURT:  Okay.

10           MR. GROVES:  And, Your Honor, may we have those as

11   well?

12           THE COURT:  Yeah.  I mean, I guess --

13           MR. WILCOX:  I mean, Mr. Groves has not asked for

14   those.

15           THE COURT:  Like, how many do you purchase at one

16   time, Mr. Wilcox?

17           MR. WILCOX:  It just depends on what they have in

18   stock.  I mean, I might purchase one, I might purchase five,

19   I might purchase ten.  It just depends on what each store,

20   what they have in stock.  And if they have the one that I

21   just sold --

22           THE COURT:  Okay.

23           MR. WILCOX:  -- and I need to get.

24           THE COURT:  Do I need to disclose that I've seen

25   my kids eat a PopSocket before, but I never have?

1          MR. GROVES:  Well, Your Honor, I mean that's just

2    a 26(e) obligation that if -- you know, it's a continuing

3    disclosure.  That's all we want is, as he continues to buy

4    him, we need to know because it's adding to the case

5    evidence here.

6          THE COURT:  Okay, yeah.  So just every time you

7    make a purchase, just make a record of it.  And then, you

8    know, maybe every month, go ahead and send the more recent

9    purchases to Mr. Groves.  Okay?

10          MR. WILCOX:  Okay.  Yeah.  So again, he hasn't

11   asked for them and I didn't know I had to keep producing

12   them.

13          THE COURT:  Yeah.  So every discovery request is

14   -- it's funny and it means both what you have now -- as long

15   as it's worded properly, what you have now and what you do

16   in the future.  So that's typical.  And what parties do is

17   they submit supplemental responses.

18          Now, I would say that that's violated all the

19   time, even by lawyers.  They don't really supplement as much

20   as they should, but it is in the rules.  Okay?

21          MR. WILCOX:  Okay.

22          THE COURT:  All right.  Anything else?

23          MR. GROVES:  Not on the --

24          MR. WILCOX:  (Inaudible)

25          MR. GROVES:  -- requests for production, Your

1    Honor.

2           But we did want to talk about the discovery cutoff

3    is coming up, you know, on the July 20th and so we wanted to

4    get a date by which he would produce this additional info.

5    And we propose June 26th and then we'd like to get -- what

6    you did before, is have us commit to a week for the

7    deposition to get those scheduled.

8           THE COURT:  Yeah.  Well, I mean I've moved so many

9    stinking deadlines in this court in the last three months

10   that one more is not going to make me bat an eye.  So don't

11   worry too much about that July 20th date.

12          I want you to get discovery done and I'm sure the

13   Wilcoxes want to get this out of their hair.  But, you know,

14   just do it as soon as practicable.  But propose a week for

15   the depositions then, please, Mr. Groves.

16          MR. GROVES:  We were looking at that -- the week

17   of July 6th.  You know, the 7th, 8th, 9th or 10th.  We get

18   -- we'll need a day for each of them and we'll, as before,

19   go down to Texas where there -- there's a Depo Center down

20   there --

21          THE COURT:  Okay.

22          MR. GROVES:  -- in Dallas.

23          THE COURT:  What about those days, Mr. Wilcox?

24          MR. WILCOX:  (Inaudible) work for me.  Lora?

25          MS. WILCOX:  What were the dates?

1           MR. WILCOX:  7th, 8th, 9th, somewhere in there?

2           MS. WILCOX:  Probably the 9th (inaudible).

3           MR. WILCOX:  The 9th works the best.

4           THE COURT:  Okay.  They'll probably need two days

5  -- well, I don't know.  I mean, Mr. Wilcox, your wife hasn't

6  really said much, but would you say that between you two,

7  you have 90 percent of the knowledge or 50 or --

8           MR. WILCOX:  My wife hardly has any knowledge

9  about this.  She doesn't operate.  She doesn't work in the

10  business.  She doesn't do anything with the business.

11          THE COURT:  Okay.

12          MR. WILCOX:  She's not even involved in the

13  day-to-day operations of it.  So really, then, in my

14  opinion, them trying to depose her, they're wasting their

15  time.  Popsockets is wasting their time and money.

16          THE COURT:  Well, so --

17          MR. WILCOX:  She's not going to have anything to

18  tell them.

19          THE COURT:  Yeah.  If all that is true, you know

20  -- well, we'll see.  I'm not going to speculate.

21          But, Mr. Groves, do you think you need two days or

22  one?

23          MR. GROVES:  Two.  Two days, Your Honor.

24          THE COURT:  So everybody's entitled to a

25  seven-hour deposition by the rules we operate under.

1          Are -- do you both intend to be present at each --

2     one another's deposition or are you just going to be alone?

3          MR. WILCOX:  I'll be alone, but then I'd be

4     present at hers.

5          THE COURT:  Okay.  So can you do one on the 9th

6     and one on the 10th?

7          MR. GROVES:  You're asking -- if you're asking me,

8     Your Honor, yes.

9          THE COURT:  No.  I'm asking the Wilcoxes.

10     MR. GROVES:  Oh, I'm sorry.

11     MR. WILCOX:  Yes.

12          THE COURT:  Okay.  All right, then make it July

13     9th and 10th.  I will not be available.  I'll be in the

14     mountains with my family.  So you're just going to have to

15     work out your own issues during the deposition.

16          So anyway, what else, Mr. Groves?

17          MR. GROVES:  Well, given that comment, Your Honor,

18     the course of the case -- can we look for a time when you

19     are available?

20          THE COURT:  Well, yes, I guess.  I mean, the next

21     week I am.

22          MR. GROVES:  I mean, I -- I'm just -- you know,

23     and I'm not being Mr. Negative here, but we've never had

24     anything but an argument.  And given that they're pro se

25     and, you know, that there may be there (inaudible).

 1    Instances --

 2              MR. WILCOX:  (Inaudible).

 3              MR. GROVES:  -- where we have to get clarification

 4    from you --

 5              THE COURT:  Well, I'm here the week of July 13th

 6    if you want.  So Mr. and Mrs. Wilcox, there -- any days in

 7    the week of July 13th work?

 8              MS. WILCOX:  I'm sorry, this is Mrs. Wilcox.  You

 9    guys are -- keep on breaking up, so we're not hearing really

10    what all you're saying.

11              THE COURT:  Okay.  So how about the week of July

12    13th.  Is there any two days there that you could do?

13              MS. WILCOX:  I'd have to look.

14              MR. WILCOX:  She's going to look real quick.

15              THE COURT:  Okay.

16              MR. WILCOX:  And while she's looking, can I get

17    the Court to order these guys to produce evidence to us of

18    our specific business contacts we have in Colorado?  They

19    have responded to us, but again, all they've given us is

20    boilerplate objections and a simple one person, Alexandria,

21    which is a PopSockets insider that placed an order with us

22    prior to them filing suit, and that was a manufactured

23    business contact.

24              We've repeatedly asked for this from them and they

25    don't want to produce any other business contacts to us that

42

1    we have in Colorado that's required, per International Shoe

2    vs. the State of Washington.

3         THE COURT:  Well, I think that probably the

4    information they got off your account will inform them about

5    that.  So, Mr. Groves, can you supplement any information

6    you have about contacts with Colorado after you digest that

7    data?

8         MR. GROVES:  Sure.  That's -- that will be part of

9    what we're producing on Monday.  We're producing all of

10   his --

11        THE COURT:  Okay.

12        MR. GROVES:  -- Colorado sales, which are

13   extensive, are his business contacts.  And we will certainly

14   be producing that on Monday, per your order, Judge.

15        THE COURT:  Very good.  Thank you.

16        MR. WILCOX:  And then what about other business

17   contacts, because this -- there's so many cases out there

18   that have been determined, such as Dundikof (ph), that just

19   because you have a -- an account present through, like,

20   Amazon, there's not established jurisdiction in the state --

21   in any state because if that were the case, we'd be

22   subjected to jurisdiction in all 50 states and worldwide if

23   that were the case.

24        THE COURT:  Sure.  And, Mr. Wilcox, did you know

25   that I wrote Dudnikof?

1           MR. WILCOX:  Yes.

2           THE COURT:  That was my case.  So --

3           MR. WILCOX:  (Inaudible).

4           THE COURT:  Okay.  Understood.

5           MR. WILCOX:  (Inaudible) that they established

6    that eBay did not have jurisdiction in Colorado -- in

7    California, that they were trying to do and that Dudnikof

8    had -- jurisdiction in Colorado was the proper jurisdiction

9    -- venue for it.  And they didn't get that.  So -- same

10   applies here.

11          If Mr. Groves -- I mean, just because we have an

12   Amazon account does not mean that we're subjected -- we

13   should not be subjected to jurisdiction in Colorado.

14          We don't -- we have barely ever stepped inside the

15   state and actually targeted any activities to Colorado.  And

16   he has yet to produce any evidence of us ever stepping into

17   Colorado and have any business relationships, having any,

18   you know, trade show relations, any kind of personal -- of

19   real property there.  That's the evidence we need.  That's

20   what must be produced and he has failed to produce any of

21   that.

22          THE COURT:  Okay.  So was somebody looking -- or

23   you were looking for those dates, Mrs. Wilcox.  How about

24   that?

25          MR. WILCOX:  Oh, yeah.

44

1           MS. WILCOX:  (Inaudible).

2           MR. WILCOX:  Yes.

3           MS. WILCOX:  The 17th works the best for me.

4           MR. WILCOX:  17th for Lora.

5           THE COURT:  Okay.

6           MR. GROVES:  And then how about we do the 16th and

7    17th, Your Honor?

8           THE COURT:  Okay by me.  But Mr. Wilcox?

9           MR. WILCOX:  That's fine with me.

10          THE COURT:  Okay, that will be it.  Put that in my

11   calendar, that the depositions will be those days.  Okay?

12          MR. WILCOX:  What?

13          THE COURT:  All right, what else?

14          MR. GROVES:  I believe that's it from the

15   plaintiff, Your Honor --

16          MR. WILCOX:  (Inaudible).

17          MR. ADLAKHA:  Your Honor, I have one more -- Mr.

18   Groves, if you'll indulge me and Your Honor.

19          MR. GROVES:  Sure.

20          MR. ADLAKHA:  Currently, our expert still has

21   access to their seller central account.  We downloaded the

22   relevant information that we need.  So that we're not

23   subject to more accusations of tinkering, we'd prefer not to

24   have that access any further.  But Your Honor, you know,

25   under 26(e), we will need to supplement at some point as we

1    get closer to trial.

2            So we're certainly happy to have Mr. Wilcox and

3    Mrs. Wilcox retract the permissions that they've given to

4    our expert, but we'd like an understanding that we may be

5    able -- that we'll have the right to get the same access

6    again at some point closer to trial just to update our

7    evidence for trial.

8            THE COURT:  Okay.  Well, I will order you not to

9    access that until further order of the Court.  Okay?

10           MR. WILCOX:  May I remove the permission.

11           THE COURT:  Pardon?

12           MR. WILCOX:  May I remove the permission?

13           THE COURT:  Yes, of course.  And then if and when

14   they want one more look-see, tell me and then we'll talk

15   about it then.

16           MR. ADLAKHA:  Do we -- so shall we file a motion

17   to seek that or should we just make a request on that --

18           THE COURT:  No.  No.  You should just set up a

19   little thing like this.  Okay?

20           MR. ADLAKHA:  Okay, very good.

21           MR. WILCOX:  So can I remove the permissions from

22   our Amazon account, then?

23           THE COURT:  Yes, you may.

24           MR. WILCOX:  Huh?  I'm sorry, what was that?

25           THE COURT:  Yes.

1          MR. WILCOX:  Okay.  Now we are also going to be

2     subpoenaing -- or sending a subpoena to Amazon to obtain

3     their audit trail for what -- for this permission.

4          So we need to have a proposed hearing in the

5     future to -- when we -- it's, hopefully, by the time we have

6     another hearing and we get Mr. Groves to produce to us what

7     they requested and so the two will -- we will have the

8     response from Amazon and we can see what they've actually

9     gone into and been doing.

10          THE COURT:  Right, but you don't have to have a

11     hearing for that.  If he receives information from Amazon by

12     a subpoena, he has to produce it to you, okay?

13          MR. WILCOX:  Yeah.  No, I --

14          MR. GROVES:  And I produced (inaudible).

15          MR. WILCOX:  Yeah, hopefully, they'll produce it.

16     But I'm saying I don't know if the audit trail's going to

17     show more of what they should not have been doing and have

18     actually been doing it and -- so that's why I want the audit

19     trail from Amazon that shows me -- every single thing

20     they've done.

21          THE COURT:  Understood.  Anything else?

22          MR. WILCOX:  When do we need to produce the blogs

23     and e-mails to Mr. Groves?

24          THE COURT:  When?

25          MR. WILCOX:  When does that need to be done by?

1           THE COURT:  Well, before your deposition for sure.

2    So why don't you try and do it in two weeks, okay?

3           MR. WILCOX:  Okay.

4           THE COURT:  All right.  Thank you all.

5           MR. WILCOX:  Okay.

6           MR. GROVES:  Thank you, Your Honor.

7           THE COURT:  All right, take care.

8           MR. ADLAKHA:  Thank you, Your Honor.

9           THE COURT:  All right, bye-bye.

10          (Whereupon, the within hearing was then in

11   conclusion at 2:26 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

48

```
 1                    TRANSCRIBER'S CERTIFICATION

 2     I certify that the foregoing is a correct transcript to the

 3     best of my ability to hear and understand the audio

 4     recording and based on the quality of the audio recording

 5     from the above-entitled matter.

 6

 7     /s/ Dyann Labo                    July 2, 2020

 8     Signature of Transcriber          Date

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```